488 P.2d 984

George Preston GORE, Petitioner,

v.

The INDUSTRIAL COMMISSION of
Arizona, Respondent,

Heflin Steel Supply Company, Respond-
ent Employer,

State Compensation Fund, Respond-
ent Carrier.

No. 1 CA–IC 391.

Court of Appeals of Arizona,
Division 1,
Department A.

Sept. 29, 1971.

Gordon S. Kipps, Tucson, for petitioner.

William C. Wahl, Jr., Chief Counsel,
The Industrial Comm. of Ariz., Phoenix,
for respondent.

Robert K. Park, Chief Counsel, State
Compensation Fund by Courtney L. Var-
ner, Phoenix, for respondent carrier.

CASE, Judge.

This case is before the Court by writ of
certiorari to test the lawfulness of an
award and findings of The Industrial
Commission of Arizona issued 3 December
1969, which found that the applicant suf-
fered no physical or mental disability re-
sulting from or attributable to his industri-
al injury of 5 May 1967.

The petitioner was involved in a serious
automobile accident in the course and
scope of his employment on 5 May 1967,
resulting in multiple injuries. The peti-
tioner was hospitalized until 23 May 1967
and continued to receive medical treatment
as an industrial responsibility until his con-
dition was deemed stationary with no per-
manent disability by a group consultation
on 11 June 1968. At that time, the consul-
tation board recommended that he resume
regular work.

The petitioner attempted to follow the direction of the consultation board, and return to regular work. In a letter from him dated 20 June 1968, he described the swelling of his left ankle which resulted in the scar splitting open, that occurred when he attempted to return to full-time employment. This letter is substantiated by a report from his attending physician, Dr. Katz. A subsequent report from Dr. Katz dated 6 August 1968 indicated that the petitioner was still under treatment.

On 8 August 1968, petitioner was stopped by a highway patrolman while driving his truck east of Buckeye, Arizona. Based on the patrolman's observations that the petitioner walked unsteadily (which petitioner alleges was due to his bad ankle) the patrolman searched the truck cab and found the petitioner's prescription drugs which his doctor had prescribed for the relief of pain and swelling in the ankle. The patrolman immediately arrested the petitioner for illegal possession of narcotics. In addition, he telephoned petitioner's employer and told him of this action. The employer immediately terminated the petitioner's employment. The drugs in question were analyzed and were found to be the prescription drugs and the petitioner was completely exonerated of any charges. In spite of the fact that his innocence of the charge had been established in a court of law, he was not reemployed.

Petitioner was examined on 10 September 1968 by Dr. Alfred F. Miller. Dr. Miller felt that the petitioner required no further treatment of his left lower extremity but was unable to state whether or not petitioner required additional treatment for his nasal deformity. Petitioner was examined by Dr. Howard P. Aidem on 30 December 1968. Dr. Aidem reported that his only question was whether there was a possibility of vascular insufficiency in the left leg. As the result of that examination, petitioner was referred to Dr. Robert B. Leonard, a vascular specialist. Dr. Leonard does not indicate when he examined the petitioner but his report to the Commission was dated 7 March 1969. Dr. Leonard reported that he found no evidence of a vascular lesion involving the left leg.

A hearing was held in Phoenix, Arizona on 22 September 1969. Seven witnesses besides the claimant, including Dr. Katz, the attending physician, and Dr. Leonard testified. Dr. Leonard, on direct examination, testified from his notes and from his recollection of the examination, substantially verifying what he had previously reported. However, on cross-examination the doctor was asked and answered as follows:

"Q. When you examined Mr. Gore on or about March 5, was there any swelling of the left ankle or the left lower part of the leg?

A. No, none at that time, no, sir.

Q. Was it discolored at all?

A. The scar was perhaps a faint reddish tinge to it which is not unusual for a scar on the shin bone.

Q. Was there any oozing or weeping in the scar area on the outside of the leg, the left leg?

A. No, sir, it was well healed.

Q. And I suspect you've answered my next question, there were no scabs in or about the area of the scar on the left leg?

A. Not at that time, no, sir.

Q. Showing you the outer aspect of Mr. Gore's left leg now which would indicate that there is some scabbing, that is not the condition of his left leg when you saw it, is it, sir?

A. No, sir, it wasn't like that at all."

In addition to Dr. Leonard's testimony admitting that the condition of the petitioner's leg as he saw it on the date of the hearing was different from that on the date of his examination, Dr. Katz testified at length of repeated problems petitioner had suffered with his leg, and also of dif-

ficulty with his nose as the result of the nasal injury at the time of the accident. Dr. Katz testified that he had seen petitioner 50 to 100 times since the consultation board had released him. He corroborated the petitioner's statement that he had seen the petitioner on several occasions just after he finished a long haul with his truck. Dr. Katz described his leg injury as soft tissue damage, damage around the main blood vessel, which had healed with scar tissue, thus presenting both the circulatory problem and a weakened condition of the skin, which combined to produce swelling which then resulted in the scar tissue breaking down and the wound splitting open again.

L. D. Thomason, a trucker, testified that he had employed the petitioner in May and June of 1969 for approximately three trucking hauls. Mr. Thomason accompanied the petitioner on these trips, and testified that his leg was swelling so badly that he could not perform the duties he was hired to do.

Another layman, Thomas Fussell, an employee of Heflin Steel and the petitioner's immediate supervisor when he worked for that company, also testified as to the condition of the petitioner's leg. He stated that when petitioner returned from a run to the Coast, he had himself personally seen his left leg swollen and on two occasions had seen it draining and broken open.

Mr. James Eugene Thompson, a self-employed truck owner hauling produce, testified that he had recently hired the petitioner to assist him on a trip to Salt Lake City. He stated that by the time the petitioner got to Salt Lake City, he was unable to assist in the unloading operation because his ankle was swollen, and that on the return trip he had a problem in using the clutch to shift gears while driving. When they returned to Phoenix, Mr. Thompson testified that he sent the petitioner home rather than having him help to unload because his ankle was swollen and dark in color.

A fellow truck driver, Dale L. Matthews, testified that he would occasionally meet Mr. Gore on the road while he was making a haul and have coffee with him. He described the petitioner's ankle as being "puffed up, swelled up, very much larger than the other one." He also mentioned that on several occasions it was oozing.

This testimony was fortified by another truck driver, Max Phillips, who also testified that he had seen the petitioner's leg when it was swollen.

In addition to the above witnesses, the petitioner testified that he was having problems with his nose due to the accident, resulting in difficulty in breathing. In addition, he testified as to the swelling and breaking open of the scar tissue in his injured left leg, and his subsequent inability to work as a result thereof.

█ The case law in Arizona clearly states that where the result of an accident is not apparent to a layman, expert medical evidence must be relied upon to determine the causal relationship between the accident and the injury. Lowry v. Industrial Commission, 92 Ariz. 222, 375 P.2d 572 (1962); Lawson v. Industrial Commission, 12 Ariz.App. 546, 473 P.2d 471 (1970). The corollary of this rule is applicable in the instant case, because here, the result of the industrial accident is clearly apparent to the laymen who have observed the petitioner in the actual working conditions of his employment. Also, our case law holds that when the evidence of the claimant is corroborated by disinterested witnesses, it may not be disregarded and reasonable statements of unimpeached witnesses are presumed true when uncontradicted. Sims v. Industrial Commission, 10 Ariz.App. 574, 460 P.2d 1003 (1969), aff'd on rehearing, 11 Ariz.App. 385, 464 P.2d 972 (1970).

█ We feel that the referee's report to the Commission with regard to the medical testimony and certain aspects of this case is worthy of comment. The referee points to the medical group consultation report of

11 June 1968, the board of which Dr. Katz was a member, which released petitioner to regular work with no further medical treatment or disability anticipated, as being in conflict with Dr. Katz's later testimony at the hearing. This is not a true conflict of medical evidence. Dr. Katz's testimony at the hearing was based upon his observation over a period of 50 to 100 examinations of the petitioner following his attempt to return to regular work as ordered by the consultation board. Dr. Leonard's testimony similarly fails to create a medical conflict when it is taken in its true context, i. e., that Dr. Leonard saw the petitioner under optimum conditions when his leg was not swollen and testified at the hearing that the leg was then not in the same condition it was at the hearing when it was swollen and scabbed over. The referee makes this statement in his report:

> "Evaluating this conflict in medical opinion, particularly in light of Mr. Gore's satisfactory performance of his required work for some ten months before termination for causes other than any physical disability in August, 1968, will justify the Commission in accepting the more probative weight of the medical opinion of the numerous experts as opposed to that of the general practitioner, even though he was the attending physician."

This one sentence contains many errors in stating the facts then before the referee and the Commission. There was ample testimony that Mr. Gore was unable to resume the full responsibility of his regular employment following his discharge by the medical consultation board. There was ample testimony to indicate that Mr. Gore was summarily fired from his job when he was erroneously charged with illegal possession of narcotics, directly related to the fact that he was taking prescription drugs ordered for him by his attending physician in order to control symptoms remaining from his industrial injury. There was evidence that the petitioner suffers a disability for work due to the un-

corrected nasal deformity suffered in the accident.

We find that the award of the Commission is not reasonably supported by the evidence.

The award is set aside.

STEVENS, P. J., and DONOFRIO, J., concur.